## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

ASHLEY DIXON,            )
                              )
          Plaintiff,        )
                              )
v.                             )       **Case No. 11-CV-780-PJC**
                              )
CAROLYN W. COLVIN,      )
Acting Commissioner of the     )
Social Security Administration,[1]  )
                              )
          Defendant.      )

## OPINION AND ORDER

Claimant, Ashley Dixon ("Dixon"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Dixon appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Dixon was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Dixon was 21 years old at the time of the ALJ hearing on June 11, 2010.  (R. 28, 33).

She testified that she believed she had completed tenth grade, and apparently she had never

obtained a GED.  (R. 33).  She said that she had difficulty with reading and writing, and she

testified that she could not read a newspaper.  *Id.*  She said she could not spell well.  *Id.*  She said

that she had difficulty getting the correct change when she purchased something.  *Id.*  Dixon

testified that she tried to work at a nursing home for four days, but she couldn't tell time well

enough to comply with schedules.  (R. 34).

Dixon testified that she did not have set responsibilities at home, but her mother would

sometimes ask her to do chores such as vacuuming.  *Id.*  She said that she had trouble completing

tasks because she would get distracted.  (R. 35).  She was able to microwave items that her

mother or grandmother bought.  *Id.*  They would tell her how long to microwave an item.  *Id.*

Dixon testified that she had a driver's license but that she did not drive without her

mother or grandmother.  *Id.*  Dixon testified that when she wanted to get her driver's license, her

mother told the officials that Dixon couldn't read.  (R. 35-36).  The officials, after reviewing

Dixon's school records, read the test to Dixon, and she passed.  *Id.*  Dixon testified that she did

not drive alone due to distractions and because she got nervous and panicky.  (R. 36).  She went

shopping with her grandmother because she couldn't count change or read well.  *Id.*

Dixon cried while being questioned, and she said she cried often due to being nervous

and panicky.  (R. 37).  She also had angry outbursts.  *Id.*  She said "anything" could cause them.

(R. 37-38).  She said that she had kicked holes in walls, but she didn't remember those incidents.

(R. 38).

Dixon said that she could not focus and concentrate on a two-hour movie, but could focus for about ten or fifteen minutes. (R. 38-39). Her focus would come and go, and after she saw the movie, she wouldn't be able to explain it to anyone. (R. 39). Dixon said that she had difficulty taking her medications due to different requirements and the number of medications. (R. 39-40). She did not notice a difference on or off her medications, but she didn't like to take them because they made her feel sleepy or tired. (R. 40). She was pregnant at the time of the hearing, and she did not know how she would handle the stress of a new baby except that her mother and grandmother would help her a lot. *Id.* For example, she might not be able to read well enough to understand the directions on a can of baby formula, but her mother or grandmother would explain it to her so that she could understand. (R. 41).

Dixon's grandmother testified that Dixon couldn't work because she got too overwhelmed. (R. 42). If Dixon decided she could not do something, she became stressed and panicked. *Id.* Dixon's grandmother said that Dixon would often telephone for help, and she would become calmer if someone was with her. (R. 43).

The administrative transcript included educational records from Afton Public Schools. (R. 175-228).

Dixon was seen at the Miami PHS Indian Health Center (the "Miami Clinic") on December 19, 2007, and she told the practitioner that she thought she might be bipolar because she was angry all of the time. (R. 262). She was diagnosed with generalized anxiety and situational stress. *Id.* At a follow-up appointment on January 22, 2008, Dixon was diagnosed with bipolar disorder, mixed episode, and she was prescribed Wellbutrin and lithium. (R. 261). On February 25, 2008, Dixon said that her anger was reduced, she was still depressed, and she was crying less. (R. 259). It appears that her prescription medications were adjusted. *Id.* On

3

March 25, 2008, Dixon reported that she felt much better.  (R. 258).  Dixon was doing well at a follow-up appointment on July 14, 2008.  (R. 255).  On October 6, 2008, Dixon was doing better and was less emotional, but she complained of insomnia.  (R. 252).  It appears that her medications were adjusted.  *Id.*

At the Miami Clinic in January 2009, it was noted that Dixon had physically attacked her mother and she had quit taking her medications because she didn't like the way they made her feel.  (R. 246).  She was restarted on different medications.  *Id.*  On February 17, 2009, it was noted that Dixon had experienced a "rough month" that included hitting her boyfriend in the head with a perfume bottle.  (R. 245).  She was diagnosed with bipolar disorder, mixed episode; and with intermittent explosive disorder.  *Id.*

Dixon attended counseling at Grand Lake Mental Health Center ("GLMHC") from May 2009 to April 2010.  (389, 411-19, 507-08).  Dixon was seen at GLMHC for pharmacological management by Shirley Chesnut, D.O. on April 24, 2009.  (R. 405-06).  The record notes an attached list of medications, but that list does not appear in the record.  *Id.*  Dixon saw Dr. Chesnut again on May 22, 2009.  (R. 403-04).  Dixon saw Dr. Chesnut again on June 19, 2009.  (R. 401-02).  After noting that Dixon was apparently "too disorganized and dysfunctional to seek any employment," Dr. Chesnut said that it was "difficult to know whether she is truly disabled but at this time she does not appear disabled to me but rather more of a Borderline Personality Disorder."  (R. 401).  Dixon saw Dr. Chesnut on August 28, 2009, and she said that she was "doing fairly well," and she had no complaint of depression.  (R. 399-400).  At appointments in October, November, and December, 2009, Dr. Chesnut adjusted Dixon's medications to help with sleep.  (R. 393-98).

Agency consultant Jan S. Kent, Ph.D., completed an intellectual evaluation of Dixon on July 30, 2007.  (R. 232-34).  Dixon's verbal IQ was 71, her performance IQ was 76, and her full scale IQ was 71.  (R. 232).  This placed her in the borderline range, at the 3rd percentile.  (R. 233).

Agency consultant Derrise L. Garner, Psy.D., completed a psychological evaluation of Dixon on July 1, 2008.  (R. 235-39).  Dr. Garner said that Dixon's attention and flow of thought were marked by indecisiveness.  (R. 236).  Dixon's affect was somewhat labile, changing from tearfulness to smiling and back without any apparent relationship to the topic.  *Id.*  Dr. Garner's diagnostic impression on Axis I[2] was bipolar disorder, not otherwise specified.  (R. 239).  On Axis II, she diagnosed borderline intellectual functioning based on Dr. Kent's testing.  *Id.*  She scored Dixon's Global Assessment of Functioning ("GAF")[3] as 42.  *Id.*  Dr. Garner listed work-related capabilities, including that, at a maximum, Dixon could understand and remember simple instructions during a normal workday.  (R. 238-39).  She said that, at a maximum, Dixon could concentrate and persist on simple tasks during a normal workday.  (R. 238).  She said that Dixon could interact in a limited contact situation involving the general public, work supervisors, and/or

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.*

co-workers during a normal workday, and she thought Dixon could adapt to a simple work environment.  (R. 238-39).

Agency nonexamining consultant Sally Varghese, M.D., completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on April 27, 2009.  (R. 316-33).  For Listing 12.04, Dr. Varghese noted Dixon's mood disturbance with depressive syndrome, manic syndrome, and bipolar syndrome.  (R. 323).  For Listing 12.05, Dr. Varghese noted Dixon's borderline intellectual functioning.  (R. 324).  For Listing 12.06, Dr. Varghese noted Dixon's anxiety.  (R. 325).  For the "Paragraph B Criteria,"[4] Dr. Varghese found that Dixon had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation.  (R. 330).  In the "Consultant's Notes" portion of the form, Dr. Varghese completed an extensive summary of Dixon's educational history, the examinations by Dr. Kent and Dr. Garner, Dixon's treating records, and the forms completed by Dixon and family members.  (R. 332).  Dr. Varghese's statement at the end of this summary was that Dixon's condition was treatable with medication and counseling.  *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Varghese found that Dixon was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (R. 316).  Dr. Varghese also found Dixon to be markedly limited in her ability to interact

---

[4] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

appropriately with the general public.  (R. 317).  She found no other significant limitations.  (R. 316-17).  Dr. Varghese said that Dixon could perform simple tasks with routine supervision, she could relate to supervisors and peers on a superficial work basis, she could not relate to the general public, and she could adapt to a work situation.  (R. 318).   She stated again that Dixon's condition was treatable with medication and counseling, and she added that Dixon functioned in the borderline IQ range.  *Id.*

Dr. Chesnut completed a form entitled "Medical Source Opinion of Ability to Do Work-Related Activities (Mental)" dated July 31, 2009.  (R. 382-84).  For thirteen mental activities, Dr. Chesnut said that Dixon had an extreme limitation in three, a marked limitation in three, a moderate limitation in three, and a slight limitation in four.  (R. 382-83).  On a second form, it was written that the length of the therapeutic relationship was approximately three months.  (R. 384).  Narrative comments included a hand-written note that Dixon could probably benefit from counseling and that many of her reactions were learned behaviors.  *Id.*  The note said that Dixon could possibly re-learn more adaptive, appropriate behaviors with therapy.  *Id.*

## Procedural History

Dixon filed an application in January 2009 for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 107-09).  The application was denied initially and on reconsideration.  (R. 63-69).  A hearing before ALJ Lantz McClain was held on June 11, 2010.  (R. 28-50).  By decision dated July 14, 2010, the ALJ found that Dixon was not  disabled.  (R. 12-23).  On October 25, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Dixon had not engaged in substantial gainful activity since her application date of January 21, 2009.  (R. 14).  At Step Two, the ALJ found that Dixon had severe impairments of borderline intellectual functioning and bipolar disorder.  *Id.*  At Step Three, the ALJ found that Dixon's impairments did not meet any Listing.  (R. 14-15).

The ALJ determined that Dixon had the RFC to perform a full range of work at all exertional levels, but was limited to simple, repetitive tasks and having no more than incidental contact with the public.  (R. 15).  At Step Four, Dixon had no past relevant work.  (R. 22).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Dixon could perform, considering her age, education, work experience, and RFC.  *Id.*  Thus, the ALJ found that Dixon was not disabled since January 21, 2009.  (R. 23).

**Review**

Dixon asserts that the ALJ erred by failing to properly consider the medical opinion of Dr. Chesnut, that the ALJ's credibility assessment was flawed, that the ALJ failed to consider the correct level of Dixon's education, and that his RFC assessment was not supported by substantial evidence.  Regarding the issues raised by Dixon, the undersigned finds that the ALJ's decision was supported by substantial evidence and complied with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Medical Opinion Evidence**

The first issue raised by Dixon is whether the ALJ properly considered the medical opinion given by Dr. Chesnut.  Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215.  *See also* 20 C.F.R. § 404.1527(d)(2).  Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527.  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection.  *Id.*

While it would have been preferable for the ALJ to state his reasons for giving Dr. Chesnut's report little weight with more clarity and specificity, the undersigned finds that the ALJ's analysis was adequate, given the totality of his decision.  As the Tenth Circuit recently

explained in affirming the portion of an ALJ's decision addressing opinion evidence:

> Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.  In conducting our review, we should, indeed must, exercise common sense.  The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).  *See also Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated on his treatment" of opinion evidence, the ALJ's decision was adequate).

The ALJ's decision is adequate.  First, the ALJ noted that Dr. Chesnut's opinions appeared to be based on Dixon's subjective reports, and the ALJ noted that there were reasons to doubt Dixon's credibility.  (R. 21).  Second, the ALJ said that the course of treatment by Dr. Chesnut was not consistent with what one would expect if Dixon were truly disabled.  *Id.*  Third, the ALJ said that the opinions reflected on the forms completed by Dr. Chesnut were contradicted by the record as a whole.  *Id.*  The ALJ gave two citations, to Dr. Varghese's Psychiatric Review Technique form (Exhibit 7F) and to an April 14, 2010 session of Dixon with her counselor at GLMHC (page 1 of Exhibit 14F), as examples.  *Id.*  The ALJ then listed activities of daily living, and finally said that while Dixon had problems she should be able to work with treatment and counseling.  *Id.*

The Court agrees with Dixon that the first two reasons summarized above venture close to improper speculation or boilerplate language.  *See Mayberry v. Astrue*, 461 Fed. Appx. 705, 708-09 n.1 (10th Cir. 2012) (unpublished); *Victory v. Barnhart*, 121 Fed. Appx. 819, 823 (10th Cir. 2005) (unpublished).  Fortunately, however, the Court does not need to reach that question because the ALJ's reasons for discounting Dr. Chesnut's opinions continued before these first

two points.  *Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate language is problematic only in

the absence of a more thorough analysis).  The ALJ went on to state that Dr. Chesnut's opinions

appeared to be contradicted by the record as a whole, and he gave specific examples to support

that statement.  Those examples were the opinions given by Dr. Varghese and the April 14, 2010

session of Dixon with her counselor at GLMHC.  There were other examples which the ALJ did

not specify but which support his conclusion that Dr. Chesnut's opinion was contradicted by the

record as a whole.  For example, the ALJ had previously summarized Dr. Garner's report, which

reflected serious issues, but the conclusions of which were not as dire as those of Dr. Chesnut.

(R. 238-39).

The ALJ's conclusion that Dr. Chesnut's opinions were contradicted by the record as a

whole was supported by substantial evidence.  This, together with the ALJ's discussion of

Dixon's activities of daily living, was sufficient to support the ALJ's discounting of Dr.

Chesnut's opinion evidence.  *See Marshall v. Astrue*, 315 Fed. Appx. 757, 761 (10th Cir. 2009)

(unpublished) (affirming ALJ's rejection of opinion evidence even when "the ALJ's discussion

could and should have been more thorough").

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *Kepler v. Chater*, 68 F.3d

12

387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court.  *Keyes-Zachary*, 695 F.3d at 1167.

      *Keyes-Zachary* is instructive in the present case, especially due to the apparent similarity of the reasons the ALJ gave in each case for finding the claimant less than fully credible.  For example, the court in *Keyes-Zachary* rejected an argument that language the ALJ used in saying that the claimant's reported activities of daily living could not be objectively verified was impermissible.  *Id.* at 1167-68.  The Tenth Circuit's reasons for finding this language acceptable prevail here, even though Dixon's arguments are somewhat different from the arguments asserted by the claimant in *Keyes-Zachary*.

      Dixon objects to additional language by the ALJ that even if her activities of daily living were as limited as reported, it was difficult to attribute that limitation to her impairments.  The *Keyes-Zachary* court rejected this objection because the ALJ had given a thorough discussion of the medical evidence.  *Id.* at 1170-71.  Here, the ALJ gave a thorough discussion of Dixon's treating records, including a GAF score of 52 given on February 18, 2010, and the April 14, 2010 record with her counselor discussed above.  (R. 18).  While these are minimal examples when compared with the decision of the ALJ in *Keyes-Zachary*, they are sufficient to save this language from being impermissible boilerplate.

      Dixon objects to the ALJ's next paragraph that says that Dixon's activities of daily living were not as limited as one would expect given her allegation of disability.  While Dixon says that this Court has previously ruled that this language was boilerplate, in the present case the ALJ gave specific examples of Dixon's activities.  The ALJ's inclusion of factual examples specifically related to Dixon saves this provision from being impermissible boilerplate.  As discussed above, boilerplate language is only impermissible if it is not followed by analysis.

*Keyes-Zachary*, 695 F.3d at 1170.  Dixon also objects to this portion of the ALJ's analysis because she contends that there is nothing about her activities of daily living that undermine her credibility.  Dixon misses the point, which is not that any of her individual activities somehow "impugn" her credibility.  Instead, the ALJ found that Dixon is a more active person than would be expected in someone who is totally disabled.  The ALJ was entitled to come to this conclusion, given the evidence.  Dixon correctly points out that the ALJ mistakenly said that Dixon had not made an attempt to enter the work force.  This mistake does not undermine the ALJ's reasoning in this paragraph of his credibility assessment.  *Keyes-Zachary*, 695 F.3d at 1173 (ALJ's statement that claimant had reported no side effects was not entirely accurate, but did not affect outcome of case).

The Court agrees with Dixon that the sentence in the ALJ's decision that there were "numerous inconsistencies" regarding Dixon's mental limitations and the objective medical evidence is meaningless boilerplate.  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered").  The ALJ gave no examples of "inconsistencies" and therefore there is nothing for this Court to review.  In spite of the ALJ's use of this boilerplate provision, because the ALJ included other supported reasons for his credibility analysis, the Court is "persuaded that the ALJ's credibility determination is closely and affirmatively linked to substantial evidence."  *Miller v. Astrue*, 2012 WL 4076128 at *4 (10th Cir.) (unpublished).

Finally, Dixon takes issue with the ALJ's statement that she had not received the type of treatment that would be expected for someone who is entirely disabled.  As is true with much of the ALJ's credibility discussion, it would have been helpful if the ALJ had given more explanation of this portion of his decision.  *Keyes-Zachary*, 695 F.3d at 1166 ("[t]he more

comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection"). The ALJ did cite to the treating records, and he had previously discussed Dixon's treatment for her psychological issues. Given this, the Court finds that the ALJ's conclusion that Dixon would have received more intense or extensive treatment if she were truly disabled is not erroneous. *See, generally, Mayberry*, 461 Fed. Appx. at 710-11.

The Court finds no reversible error in the ALJ's credibility assessment.

**Education Level**

Dixon argues that the ALJ and the vocational expert (the "VE") did not consider her true educational level in deciding that there were jobs that she could perform at Step Five. At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089.

Dixon argues that while she testified that she had completed the tenth grade, her "true" educational level should be much lower. She cites a regulation that states that "the numerical grade level that [a claimant] completed in school may not represent [the claimant's] actual educational abilities." 20 C.F.R. § 416.964. Dixon cites to no cases overturning an ALJ decision based on this regulation.

When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997). Dixon was represented by counsel at the hearing, and she asked the VE if someone with the limitations found by Dr. Chesnut could perform work. (R. 48-49). She did not ask any other questions, including any questions related to Dixon's "true" educational ability. The attorney

did, however, at the outset of the hearing note that IQ testing had shown that Dixon read at a fifth

grade level, and her spelling was on a third grade level.  (R. 31).  During Dixon's testimony, right

after she testified that she had completed the tenth grade, Dixon was asked by the ALJ if she

could read and write, and she said "No, I, no, I can, there's some words that I do know.  I can't

spell very well at all."  (R. 33).  She said that she could not read a newspaper.  *Id.*  Dixon also

testified that she was given the driving test orally due to her poor reading skills, and that she

would have trouble following a grocery list if she did not recognize the words.  (R. 35-37).

From this limited information, Dixon asks the Court to find that she could not perform

the jobs identified by the VE of janitor and dishwasher because they require language ability at a

higher level than Dixon's ability.  She concedes, however, that the dishwasher job requires only

the ability to read and write simple sentences.  There is nothing in Dixon's testimony that states

unequivocally that she is unable to read or write simple sentences.  The evidence of the IQ tests

that she reads at a fifth grade level and her spelling is at a third grade level appears to indicate

that Dixon is capable of reading and writing simple sentences.  Under all of the circumstances of

Dixon's case, the Court finds that the Commissioner met his burden to establish that there were

jobs that Dixon could perform given her education.

**RFC Determination**

Dixon's final argument is that the ALJ erred by failing to include in his RFC

determination all of the limitations found by the state agency consultants.  This argument is based

on *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007).  The claimant in *Haga* had numerous

physical and mental impairments, and the ALJ had included nonexertional restrictions in his RFC

determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact

with the public," and "no requirement for making change."  *Id.* at 1207.  A consulting examiner

16

had completed an RFC form indicating that the claimant was moderately impaired in seven

functional categories.  *Id.*  The claimant argued that the ALJ had implicitly rejected the

consulting examiner's opinion by failing to include any accommodations in his RFC

determination that addressed the examiner's assessment that the claimant had moderate difficulty

in her ability to deal appropriately with supervisors and coworkers and to respond appropriately

to workplace pressures and changes.  The ALJ had given no explanation relating to why he did

not address some of the findings of moderate restrictions while including others, and the Tenth

Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary

support for his RFC determination.  *Id*. at 1207-08.

The present case differs significantly from the facts of *Haga*.  In *Haga*, the consultant

marked boxes of "moderately limited" regarding the claimant's ability to deal appropriate with

supervisors and coworkers.  *Id.* at 1207.  Here, the agency consultant checked boxes of  "not

significantly limited" on the Mental Residual Functional Capacity Assessment form in relation to

Dixon's ability to relate appropriately with supervisors and coworkers.  (R. 317).  Then, in

Section III of the form, the consultant appeared to confirm this finding by stating in the

affirmative that Dixon "can relate to supervisors and peers on a superficial work basis."  (R.

318).  This, for example, was in stark contrast to the statement of the consultant that Dixon

"cannot relate to the general public."  *Id.*  The ALJ included in his RFC that Dixon could have

"no more than incidental contact with the public," but he did not include any language regarding

coworkers or supervisors.  The Court concludes that the ALJ's RFC determination was consistent

with the forms completed by the agency consultant and *Haga* does not apply.

The ALJ's RFC determination was supported by substantial evidence and was in compliance with legal requirements.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 27th day of March 2013.

Paul J. Cleary
United States Magistrate Judge